

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GROVER SELLERS
ATTORNEY GENERAL

This Opinion
Modifies Opinion
#0-5248

Dr. C. S. Fraps
State Chemist
Chief, Division of Chemistry
A. & M. College of Texas
College Station, Texas

Dear Sir:

Opinion No. O-5248-A
Re: Reconsideration and Revision of Opinion No. O-5248, relating to registration and labeling of agricultural insecticides and fungicides.

In the absence of the author of our Opinion No. O-5248, who is now in the Army, your request for a reconsideration of that opinion has been referred to the writer.

For the sake of convenience, we will quote the pertinent provisions of the statute, and then consider in turn each of the questioned statements in the opinion:

"Sec. 5. All corporations, firms, or persons, before selling or offering for sale any agricultural insecticide or fungicide for use within this state, shall brand or attach to each package a plainly printed statement, showing the brand or name of said insecticide or fungicide; the net weight, or volume if liquid, of the contents of the package; the name and address of the corporation, firm, or person registering said insecticide and the minimum percentage guaranteed to be present, of total arsenic, and the maximum percentage of water-soluble arsenic if such are present, and the names and percentage amounts of each inert ingredient; or, in place of the names and percentage amounts of each inert ingredient, the names and percentage amounts of each and every ingredient having insecticidal or fungicidal properties, and the total percentage of inert ingredients. All branding or labeling must be durable

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

and legible, and so placed and arranged as to be easily read.

".  .  .  .

"Sec. 6 (a)  All firms, corporations, or persons now or hereafter engaged in selling agricultural insecticides or fungicides, before selling or offering for sale any agricultural insecticide or fungicide for use as an agricultural insecticide or fungicide within this state, shall annually file with the Commissioner of Agriculture an application for registration giving the information required by Section 5 of this Act; providing, however, that all firms, corporations, or persons, now, at the time of the passage of this Act, selling or offering for sale any agricultural insecticide or fungicide for use as an agricultural insecticide or fungicide within this state, shall have thirty (30) days from the effective date of this Act within which to file first applications for registration as required by this Act.

"(b)  A copy of the label to be attached to each package shall be filed with the Commissioner of Agriculture on or before delivery to the dealers, agents or consumers in this state; and such label shall truly set forth the data required in Section 5 of this Act; and be otherwise in accordance with the provisions of this Act.  On receipt of the application for registration above described, the registration fee, and the copy of the label, and after all other requirements of this Act have been complied with, the Commissioner of Agriculture shall issue a certificate of registration for the agricultural insecticide or fungicide, which shall be in force until the succeeding September first.

"(c)  Any firm, corporation, or person, who has registered agricultural insecticides or fungicides for sale within the state of Texas, shall

furnish upon request of the Commissioner of Agriculture, within five (5) days of receipt of such request, a statement showing the official name of the agricultural insecticide or fungicide and the names and addresses of a reasonable number, not exceeding ten persons, within the state of Texas, to whom it has been sold.

"(d) Whenever it shall appear to the Commissioner of Agriculture that any firm, corporation, or person is selling or offering for sale any misbranded or adulterated agricultural insecticide or fungicide for use in this state as an agricultural insecticide or fungicide which has been registered under the provisions of this Act, it shall be the duty of the Attorney General, or any District or County Attorney of this State, upon request of the Commissioner of Agriculture, in addition to any other remedies, to institute a civil suit in the District Court of the proper county in the name and on behalf of the State of Texas, as plaintiff, and in the name of the firm, corporation, or person to whom the registration certificate was issued for such agricultural insecticide or fungicide, as defendant, to forfeit and cancel such registration, and service shall be had as in other civil cases. Any and all suits brought by the state under this section must be brought in Travis County, or in the county of the domicile or residence of the manufacturer of the agricultural insecticide or fungicide, or in the county where the agricultural insecticide or fungicide was sold or offered for sale, or in the county where the agricultural insecticide or fungicide was to be used or is used as an agricultural insecticide or fungicide.

"If, upon the trial of such cases, it shall be determined that said agricultural insecticide or fungicide is misbranded or adulterated within the meaning of this Act, then the registration of such agricultural insecticide or fungicide shall be forfeited and cancelled and the sale of such misbranded or adulterated agricultural insecticide and fungicide shall be enjoined in accordance with the judgment of the Court.

"....

"Sec. 10. For the sole purpose of defraying the expenses connected with the inspection of agricultural insecticides or fungicides sold, or exposed or offered for sale, in this state, and with the making of examinations and analyses thereof, all firms, corporations or persons engaged in the manufacture or sale of agricultural insecticides or fungicides shall, in place of a tonnage tax, pay annually to the Commissioner of Agriculture an inspection tax of Twenty-five ($25.00) Dollars for registration of the agricultural insecticide and fungicide, provided that the total of the registration fees for any one firm shall not exceed One Hundred ($100.00) Dollars. But in cases where the registration fees have been paid, either by the manufacturer or by the jobber, as required by this section, then in that event nothing in this section shall be construed as applying to retail dealers selling agricultural insecticides and fungicides. All such registration fees collected shall be deposited with the State Treasurer and shall be paid into the General Revenue Fund of the State of Texas.

"....

"Sec. 15. Section 6 of this Act shall not be construed as applying to retail dealers selling agricultural insecticides or fungicides when the manufacturer or jobber of such insecticides or fungicides has registered such products as required by this Act.

"....."

The above quoted provisions are parts of Article 153b-1, V. A. C. S. (Senate Bill 5, Acts 48th Legislature, Regular Session, Chapter 98).

1. You question the correctness of the following interpretation of Section 10 of the Act:

"In the case of a manufacturer a registration fee of $25.00 must be paid for each agricultural insecticide or fungicide manufactured in Texas. The jobber is likewise required to pay such fee for each such insecticide or fungicide which the jobber sells in Texas."

In this connection you say:

"The law states that in cases where the registration fees have been paid either by the manufacturer or the jobber, then in that event, nothing in this section shall be construed as applying to retail dealers. This wording clearly means that either one may register, but that both are not required to register."

We have carefully reconsidered these statements in the opinion, in the light of your criticisms. It is to be noted that the provisions of Sections 6 and 10, quoted above, apply, by their plain terms, to "all" firms, corporations or persons engaged in selling any agricultural insecticide or fungicide for use in this state, with the one exception specified in Sections 10 and 15 – of retail dealers in a product registered, as required by the Act by either the manufacturer or the jobber. "The fact that an act contains one or more exceptions discloses an intention on the part of the Legislature that there should be no other exception and that the Act should apply in all cases not excepted." 39 Texas Jurisprudence 191. Federal Crude Oil Co. v. Yount-Lee Oil Co. (Sup. Ct. of Texas) 52 S. W. (2d) 56.

If further proof of the intention of the Legislature in this particular matter be needed, it is to be found in the legislative history of the Act. On March 4, 1943, the House of Representatives amended Senate Bill No. 5, substituting in lieu of the proviso now contained in Section 10 the following language:

". . . ., but any agricultural insecticide or fungicide already registered by the manufacturer or jobber need not be registered by any other person selling said agricultural insecticide or fungicide during the period of such registration. . . ." (Underlining ours) House Journal, 48th Legislature, page 753, 756.

But the Senate refused to concur in the House amendments
(Senate Journal, March 9, 1943), and the bill was finally
passed by both houses in its present form. Thus the Legis-
lature rejected the proposal that the exception in the pro-
viso be applied to other than retail dealers.

II. You also object to the following portion of
the opinion:

"With reference to the first part of your
third question, it is the opinion of this department
that out-of-state manufacturers are not required
to brand their containers, under the provisions
of the Texas Act, when the sale is made for de-
livery into Texas, either through retail stores
or the manufacturer direct. We assume of course
that the transaction is one in interstate com-
merce. The power to regulate commerce among the
several states is reserved exclusively to Congress.
Constitution of the United States, Section 8,
Clause 3." (Reference to U. S. Constitution
should be Article I, Sec. 8, ol. 3.)

We think your objection to this portion of the opin-
ion well taken, and amply supported by the United States Su-
preme Court decisions cited by you. This statute does not pur-
port to place any restriction whatever upon the selling or
offering for sale of insecticides or fungicides beyond the
boundaries of Texas, even when intended for use in Texas, and,
if it did, would be to that extent a nullity. But as a law-
ful exercise of the State's police power to prevent fraud and
imposition upon Texas purchasers, not aimed at interstate com-
merce and without any discrimination against out-of-state manu-
facturers and dealers, it places a valid restriction upon all
such sales and offers of sale made within the State of Texas,
regardless of any incidental interference with interstate com-
merce. Patapsco Guano Co. v. Board of Agriculture of North
Carolina, 18 S. Ct. 862, 171 U. S. 345, 43 L. Ed. 191; Corn
Products Ref. Co. v. Eddy, 39 S. Ct. 325, 249 U. S. 427, 63
L. Ed. 689; Savage V. Jones, 225 U. S. 501, 56 L. Ed. 1182,
32 S. Ct. 715; Standard Stock Food Co. v. Wright 225 U. S. 540,
56 L. Ed. 1197, 32 S. Ct. 784.

We think the following statements of the United States Supreme Court, found in the opinion in the first case cited above, are decisive of this question:

"Inspection laws are not in themselves regulations of commerce, and while their object frequently is to improve the quality of articles produced by the labor of a country and fit them for exportation, yet they are quite as often aimed at fitting them, or determining their fitness, for domestic use, and in so doing protecting the citizen from fraud. Necessarily, in the latter aspect, such laws are applicable to articles imported into, as well as to articles produced within a state.

". . . .

"Whenever inspection laws act on the subject before it becomes an article of commerce they are confessedly valid, and also when, although operating on articles brought from one state into another, they provide for inspection in the exercise of that power of self-protection commonly called the police power.

"No doubt can be entertained of this where the inspection is manifestly intended, and calculated in good faith, to protect the public health, the public morals, or the public safety. Minnesota v. Barber, 136 U. S. 313 (34 455, 3 Inters, Com. Rep. 185). And it has now been determined that this is so, if the object of the inspection is the prevention of imposition on the public generally.

". . . .

". . . It being competent for the state to pass laws of this character does the requirement of inspection and payment of its cost bring the act into collision with the commercial power vested in Congress? Clearly this cannot be so as to foreign commerce, for clause two of § 10 or Article 1 expressly recognizes the validity of state inspection

Dr. G. S. Fraps, page 8

laws, and allows the collection of the amounts necessary for their execution; and we think the same principle must apply to interstate commerce. In any view, the effect on that commerce is indirect and incidental, and 'the Constitution of the United States does not secure to anyone the privilege of defrauding the public.'"

It is therefore our opinion that said Senate Bill No. 5 (Article 1b3b-1, V. A. C. S.) applies to all sales and offers of sale, made in Texas, of agricultural insecticides and fungicides, for use in Texas, except those specifically exempted therein, regardless of whether any such sale or offer for sale may involve a transaction in interstate commerce.

Our opinion No. O-5248 is revised to the extent indicated herein.

Yours very truly,

ATTORNEY GENERAL OF TEXAS

By

W. R. Allen
Assistant

WRA:db:ls

CC:   Department of Agriculture
      Austin, Texas
      Attn:  Mr. Chas. E. Baughman

APPROVED NOV 23, 1943
Grover Sellers
First Assistant
Attorney General

This opinion
condidered and
approved in
limited
conference

WRA:gm